UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ENGINE CAPITAL MANAGEMENT, LP,            :

                                          :

                        Plaintiff,        :     21 Civ. 149 (VM)

                                          :

      - against -                         :     **DECISION AND ORDER**

                                          :

ENGINE NO. 1 GP LLC, et al.,              :

                                          :

                        Defendants.       :
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: April 12, 2021
```

**VICTOR MARRERO, United States District Judge.**

Plaintiff Engine Capital Management, LP ("Engine Capital" or "Plaintiff") brought this action against Engine No. 1 GP LLC, Engine No. 1 NY LLC, Engine No. 1 LLC, Engine No. 1 LP, Christopher James ("James"), and Charles Penner ("Penner") (collectively, "Defendants") for trademark infringement in violation the Lanham Act ("Count One"), cybersquatting in violation of the Lanham Act ("Count Two"), common law trademark infringement ("Count Three"), and injury to business reputation or trademark-infringement dilution in violation of New York General Business Law § 360-l ("Count Four") stemming from Defendants' use of the "Engine" mark. (See First Amended Complaint ("FAC"), Dkt. No. 15.)

Now before the Court are two motions. First is Engine Capital's motion for a preliminary injunction enjoining and

1

restraining Defendants from using Engine Capital's "Engine" or "Engine Capital" marks, or any element confusingly similar to those marks, as or part of a trademark, trade name, or internet domain name in connection with public-market investments. (See Motion for a Preliminary Injunction, Dkt. No. 40; Plaintiff's Memorandum of Law ("Pls. Mem."), Dkt. No. 49.) Defendants oppose the Motion. (See Defendants' Memorandum of Law in Opposition ("Opposition"), Dkt. No. 56.)

Second is Defendants' letter motion requesting a premotion conference and leave to file a motion to dismiss the FAC. The Court construes the letter as a motion to dismiss[1] pursuant to Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6) (the "Letter Motion," Dkt. No. 36). Plaintiff opposes the Letter Motion. (See "March 3 Letter," Dkt. No. 39.)

For the reasons that follow, the Court DENIES Plaintiff's motion for a preliminary injunction and GRANTS in part and DENIES in part Defendants' Letter Motion to dismiss the FAC.

---

[1] See Kapitalforeningen Lægernes Invest. v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (affirming the district court ruling deeming an exchange of letters as a motion to dismiss).

## I. BACKGROUND[2]

A.   THE FAC'S ALLEGATIONS

Engine Capital is a limited partnership and a leading investment management firm. Engine Capital has used the "Engine Capital" and "Engine" marks since as early as July 2013 for its management and investment services. Engine Capital has gained notoriety and influence for its branded investment advisory services related to public markets and shareholder activism. Engine Capital is marketed towards institutional and retail high-net-worth investors. Engine Capital contends that it is widely referred to and known as "Engine" in the activist and investment management industry.

Engine Capital is an activist shareholder. An activist shareholder is a shareholder in a public company that takes an active role by trying to influence the company's governance, strategy, operations, mergers and acquisitions policies, allocation of capital, and corporate policies. Engine Capital has been mentioned in various media pieces on shareholder activism and has received other industry honors. Engine Capital alleges that because of its

---

[2] The factual background herein derives from the FAC, as well as from the exhibits filed in connection with Plaintiffs' Memorandum of Law and

reputation, it has successfully negotiated board representation with many publicly traded companies, which has been critical to its success.

Engine Capital owns the U.S. Trademark Application Serial No. 90453755 for "Engine Capital" for investment management services, investment advisory services, asset management services, and advisory services in the field of shareholder activism. Engine Capital also owns the U.S. Trademark Application Serial No. 90453764 for "Engine" for the same set of services.

Defendants are a new investment fund that focuses on shareholder activism. James and Penner are the principals of Engine No. 1 GP LLC, Engine No. 1 NY LLC, and Engine No. 1 LLC and launched the fund in December 2020. Defendants use "Engine No. 1" as a service mark and trade name in connection with the investment fund. Defendants also own the website www.engine1.com and the website www.engineno1.com, which redirects to www.engine1.com (the "Engine1 Website"). The Engine1 Website uses the marks "Engine No. 1" and "Engine" to promote corporate activism and financial services. Defendants are also alleged to have

---

Defendants' Opposition. Except when specifically quoted or referenced, no further citation to these sources will be made.

used the term "Engine" to identify themselves in connection with a proxy contest with Exxon Mobil Corporation.

On October 20, 2020, Engine No. 1 GP LLC filed an intent to use trademark application Serial No. 90267238 with the U.S. Patent and Trademark Office ("USPTO") for "Engine No. 1" in Class 36 covering generally and specifically:

> (a) investment management services; (b) financial services, namely, providing investment management strategies in the fields of long and short equity, absolute return, low net market exposure, private and public debt, private and public equity, and shareholder activism; (c) financial information relating to shareholder activism, mergers, acquisitions, and corporate transactions, debt finance, debt trading and debt issuance; and (d) investment management services and financial services.

(FAC ¶ 32 (emphasis omitted).)

Engine Capital alleges that Defendants' use of the marks "Engine No. 1" and "Engine" in connection with its investment services and shareholder activism has caused or will cause confusion in the investment community in which these entities operate. Engine Capital further alleges that third parties are likely to be confused as to the source of Defendants' services and may believe they are in fact Engine Capital's services, originate with Engine Capital, or are otherwise connected with Engine Capital. Engine

Capital states that Defendants will target the same clients Engine Capital targets. According to Engine Capital, Defendants have injured Engine Capital through the use of its marks and has caused and will continue to cause irreparable injury to it for which there is no adequate remedy at law.

With respect to James and Penner, Engine Capital alleges that as principals of the defendant entities, they "have been[] the moving, acting and conscious force who caused the direct infringement and wrongdoing that is at issue in this action" because James and Penner controlled and directed the defendant entities. (Id. ¶¶ 38-39.)

B.    THE EVIDENCE SUBMITTED FOR PURPOSES OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

In support of its Motion for a Preliminary Injunction, Engine Capital provides evidence consisting of its trademark applications, media articles and reports discussing Engine Capital, internal reports and communications concerning Engine Capital's performance, news articles about the launch of Engine No. 1 and its Exxon Mobil proxy fight, offering and marketing materials from Engine No. 1, Defendants' trademark application, and details of other third-party marks containing the term

6

"engine" in Class 36.

Engine Capital has also submitted various affidavits. For instance, Engine Capital filed an affidavit of Arnaud Ajdler ("Ajdler"), its founder and managing partner. Engine Capital also submitted affidavits of five individuals familiar with the industry and Engine Capital, including two Engine Capital investors who mistakenly believed that Engine No. 1 was affiliated with Engine Capital. One of the investors, Adam Semler, saw an article about Engine No. 1 investing in Exxon and reached out to Ajdler to "express [his] displeasure" with that investment. ("Semler Decl.," Dkt. No. 46.) Ajdler informed Semler that Engine Capital was not affiliated with Engine No. 1. The other individuals also confused the two and subsequently learned, either through inquiring of Ajdler or other means, that there was no connection between Engine Capital and Defendants.

Engine Capital submitted the affidavit of Professor Frank Partnoy, a professor of law at the University of California Berkeley School of Law whose areas of teaching and research include public equity financial markets and shareholder activism. ("Partnoy Decl.," Dkt. No. 42.) Professor Partnoy notes that "the rise of text analytics and algorithmic trading . . . have increased the potential

for confusion in investor and stakeholder reactions to announcements and media coverage," noting that "there is evidence that the public equity financial markets react to the use of a particular word that is in a firm's name, even when the use of the word is irrelevant to the firm." (<u>Id.</u> ¶ 27.) To support this proposition, Professor Partnoy cites the example of Signal Advance, Inc., a small medical device company, whose stock price rose after being confused with the messaging app Signal. Professor Partnoy also states that "confusion can arise even when investors and stakeholders are sophisticated." (<u>Id.</u>)

Defendants' evidence includes Defendants' trademark application, a list of trademark registrations and applications from the USPTO database in the financial-services class containing the word "engine," a record from the USPTO provisionally granting Defendants' trademark application for "Engine No. 1," news articles and media sources mentioning Defendants, copies of Defendants' websites, and various other materials pertaining to Defendants' Exxon campaign.

Defendants submitted the affidavit of David Swift ("Swift"), the Chief Operating Officer of Engine No. 1 LP. Swift explains that James named Engine No. 1 after one of

the oldest firehouses in San Francisco, where James resides. Swift states that James sought to evoke the imagery of a firehouse or fire truck because a firehouse "brings together a community" as do Defendants, whose "investments align the interests of shareholders and stakeholders seeking to create a positive change along with positive returns." ("Swift Decl.," Dkt. No. 57 ¶ 4.) Swift worked with James when James was naming the company and notes that James conducted a trademark search during that process.

Defendants also submitted the affidavit of an expert witness, Joseph Grundfest, a professor of law at Stanford Law School. Professor Grundfest concludes that reasonably prudent institutional or high-net-worth investors would be unlikely to confuse Engine Capital and Defendants and notes that similarities in corporate names in the financial sector are not rare and do not appear to cause meaningful confusion. Professor Grundfest also highlights various perceived issues with Professor Partnoy's techniques.

C.   THE PARTIES' ARGUMENTS

1.   Preliminary Injunction Arguments

Engine Capital argues that it is entitled to a preliminary injunction because it is likely to succeed on

9

the merits of its Lanham Act and state law claims. As to the Lanham Act trademark infringement claim, Engine Capital argues that it holds valid, protectible marks and that a likelihood of confusion exists. In support of the latter contention, Engine Capital asserts that Engine Capital's marks are strong and similar to Defendants' mark; Engine Capital and Defendants operate in the same market; there is significant evidence of actual confusion, as demonstrated by the affidavits; Defendants lacked good faith; and Defendants lack an established reputation, thereby potentially tarnishing Engine Capital's excellent reputation.

Defendants argue that Engine Capital's motion fails because its marks are weak and because it cannot show a likelihood of confusion among the typical consumers of the parties' services, who are sophisticated investors that are likely to conduct due diligence before investing large amounts of money. Defendants note that their mark evokes the impression of a firehouse or fire truck and thus distinguishes them from Engine Capital and other firms. Defendants also point to evidence suggesting that the parties do not compete for the same investors and that Defendants acted in good faith in adopting their mark.

Defendants further argue that Engine Capital has failed to show actual confusion that affected investment decisions or a risk of tarnishing Engine Capital's reputation. Defendants additionally contend that no irreparable harm exists.

### 2.   Dismissal Arguments

Defendants make two arguments in their Letter Motion.[3] First, Defendants argue that Engine Capital has failed to allege facts or provide evidence of anything beyond the mere possibility of confusion or dilution. Defendants further contend that the claims fail because Engine Capital has only made conclusory allegations with respect to irreparable harm and injury to goodwill or reputation. Moreover, Defendants argue Engine Capital's cybersquatting claim is deficient because Engine Capital has failed to sufficiently allege bad faith. Second, Defendants contend that Penner cannot be sued personally because there are only conclusory allegations supporting Engine Capital's contention that Penner was a moving, active, conscious force behind Defendants' alleged infringement.

In response, Engine Capital notes that no evidence of

---

[3] Defendants originally argued that personal jurisdiction had been insufficiently alleged as to certain defendants, but they have since withdrawn that argument. (See Dkt. No. 65.)

likely confusion is needed at the motion-to-dismiss stage. Engine Capital also argues that a presumption of irreparable harm applies once Engine Capital has demonstrated a likelihood of succeeding on the merits. Finally, Engine Capital asserts that bad faith has been pled based on allegations that Defendants entered into competition with Engine Capital in the same market and must have been fully aware of the strength of Engine Capital's marks. Engine Capital also argues that Penner's liability has been adequately pleaded because the FAC alleges his role as a principal; that he is a moving, active, and conscious force behind Defendants' wrongdoing; and that he intentionally and purposefully directed and controlled Defendants' acts.

## II. <u>LEGAL STANDARD</u>

A. <u>PRELIMINARY INJUNCTION</u>

To obtain a preliminary injunction, a plaintiff must show: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." <u>N. Am. Soccer League, LLC v. U.S. Soccer Fed'n</u>, 883 F.3d 32, 37 (2d Cir. 2018).

The showing of irreparable harm "is the single most important requisite." LSSi Data Corp. v. Time Warner Cable, Inc., 892 F. Supp. 2d 489, 501 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). To demonstrate irreparable harm, the movant must show "an injury that is neither remote nor speculative, but actual and imminent." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (internal quotation marks and citation omitted). The movant must further show that the injury "cannot be remedied by an award of monetary damages." Id.

"Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial because loss of control over one's reputation is neither calculable nor precisely compensable." N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 3d 305, 343 (S.D.N.Y. 2010) (citation omitted). In cases involving Lanham Act claims, irreparable harm is to be presumed if a plaintiff first establishes a likelihood of succeeding on the merits. 15 U.S.C. § 1116(a). "By the same token, however, if the plaintiff does not show likelihood of success on the merits, it cannot obtain a preliminary injunction without making an independent showing of likely

13

irreparable harm." Fed. Express Corp. v. Fed. Espresso, Inc., 201 F.3d 168, 174 (2d Cir. 2000).

"When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint." Victorio v. Sammy's Fishbox Realty Co., No. 14 Civ. 8678, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014) (citing Incantalupo v. Lawrence Union Free Sch. Dist. No. 15, 652 F. Supp. 2d 314, 317 n.1 (E.D.N.Y. 2009)). Although a plaintiff's burden at the preliminary-injunction stage is less than at the summary-judgment stage, see Gluco Perfect, LLC v. Perfect Gluco Prods., Inc., No. 14 Civ. 1678, 2016 WL 11469931, at *4 n.2 (E.D.N.Y. Jan. 7, 2016), the plaintiff must submit evidence sufficient to support a finding that the plaintiff will likely succeed on the merits and suffer irreparable harm, as the plaintiff bears "the burden of proof on their motion for a preliminary injunction," Sunni, LLC v. Edible Arrangements, Inc., No. 14 Civ. 461, 2014 WL 1327880, at *3 (S.D.N.Y. Apr. 3, 2014). While the evidence need not be "compelling" per se, it should be enough to allow a court to conclude that the plaintiff is likely to prove the

relevant facts "by a preponderance of the evidence." <u>Fed.
Express</u>, 201 F.3d at 177.

B.   <u>MOTION TO DISMISS</u>

"To survive a motion to dismiss [pursuant to Federal
Rule 12(b)(6)], a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that
is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S.
662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550
U.S. 544, 570 (2007)). This standard is met "when the
plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged." <u>Id.</u> A court should not dismiss
a complaint for failure to state a claim if the factual
allegations sufficiently "raise a right to relief above the
speculative level." <u>See</u> <u>Twombly</u>, 550 U.S. at 555. The task
of the Court in ruling on a motion to dismiss is to "assess
the legal feasibility of the complaint, not to assay the
weight of the evidence which might be offered in support
thereof." <u>In re Initial Pub. Offering Sec. Litig.</u>, 383 F.
Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks
and citation omitted).

Unlike at the preliminary-injunction stage, for
purposes of a motion to dismiss, a Court must accept all

well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2011)). Thus, a plaintiff at the preliminary-injunction stage has a "heavier burden" than a plaintiff "bears in pleading the plausible claim necessary to avoid dismissal." New Hope Family Servs., Inc. v. Poole, 966 F.3d 146, 165 (2d Cir. 2020).

C.   THE LANHAM ACT

A plaintiff alleging trademark infringement under the Lanham Act "must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 84 (2d Cir. 2020).

When analyzing the first prong, courts assess whether the marks at issue are distinctive, that is, "serve[] to identify a particular source." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); see also Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997). "A registered mark enjoys a presumption of distinctiveness." Alzheimer's Disease & Related Disorders

16

Association, Inc. v. Alzheimer's Foundation of America, Inc., 307 F. Supp. 3d 260, 285 (S.D.N.Y. 2018).

When analyzing the second prong, courts use the eight-factor test articulated in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.3d 492 (2d Cir. 1961) (the "Polaroid Factors"):

> (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will 'bridge the gap' by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers.

Tiffany, 971 F.3d at 84-85 (footnotes omitted).

### III. **DISCUSSION**

The Court is not persuaded that Engine Capital is entitled to injunctive relief. Engine Capital has not shown a likelihood of success on the merits of its Lanham Act claims. Nor has Engine Capital shown that it will suffer irreparable harm absent an injunction. The Court further concludes that Engine Capital has failed to allege any facts supporting Penner's individual liability or Defendants' bad faith in registering its domain as

17

necessary for Engine Capital's cybersquatting claim. However, the allegations for the remaining counts are sufficient at this initial stage. Therefore, the Court denies Engine Capital's motion for a preliminary injunction and grants in part and denies in part Defendants' Letter Motion to dismiss the FAC.

A.   PRELIMINARY INJUNCTION

Engine Capital's motion for a preliminary injunction fails, primarily because Engine Capital has not satisfied the requirement of showing irreparable harm. A presumption of irreparable harm does not apply because Engine Capital cannot demonstrate a likelihood of success on the merits of its Lanham Act claims. The Court addresses first the likelihood of success on the merits of the Lanham Act claims and then turns to irreparable harm.

1.   Likelihood of Success on the Merits

Engine Capital is unlikely to succeed on its Lanham Act claims. As to Engine Capital's claim for trademark infringement, the Court cannot conclude based on the evidence put forth that Engine Capital is likely to "establish a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or confused as to the source of sponsorship of the goods in

question." <u>Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.</u>, 634 F. Supp. 1468, 1476 (S.D.N.Y. 1986). As to its claim for cybersquatting, the Court is not persuaded that the evidence supports a likely finding that Defendants acted with "a bad faith intent to profit from [Engine Capital's] mark." <u>N.Y.C. Triathlon</u>, 704 F. Supp. 2d at 324.

### a.   Trademark Infringement

On balance, the <u>Polaroid</u> Factors do not support Engine Capital's position.[4] Even assuming for the sake of argument that the factors pertaining to the strength of Engine Capital's mark, the proximity of Engine Capital and Defendants' services, and Engine Capital's ability to "bridge the gap" weigh in favor of Engine Capital,[5] the remaining factors do not.

### i.   Degree of Similarity

The second <u>Polaroid</u> Factor -- the degree of similarity between the marks -- weighs in favor of Defendants. This inquiry involves looking at "how [the marks] are presented in the marketplace," <u>The Sports Auth., Inc. v. Prime</u>

---

[4] Because the Court concludes that Engine Capital has not demonstrated a likelihood of success on the second prong of the test for trademark infringement under the Lanham Act, the Court need not address the first prong, which is whether Engine Capital has a valid mark entitled to protection.

[5] Because the Court need not, and does not, address these factors in order to conclude that a preliminary injunction is unwarranted, it is

Hospitality Corp., 89 F.3d 955, 962 (2d Cir. 1996). "In evaluating similarity, a court looks at how a mark as a whole sounds, looks and feels -- reviewing the size of a mark, design of a logo, the typeface, how a word sounds when spoken." Flushing Bank v. Green Dot Corp., 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015). Use of the same word "does not necessarily make the marks similar for purposes of assessing confusion under a *Polaroid* analysis." Medici Classics Prods. LLC v. Medici Grp. LLC, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) (citing cases). "Factors which courts consider in this regard include mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-ins, such as a mascot." Flushing Bank, 138 F. Supp. 3d at 587.

Although both Engine Capital and Defendants' marks use the word "Engine," the marks are sufficiently distinct as presented in the marketplace. The Court is persuaded that the inclusion of "No. 1" in "Engine No. 1" suggests imagery of a firehouse or firetruck as Defendants contend.[6] Fire

---

unnecessary for the Court to analyze the proffered experts' analyses on these factors.

[6] Engine Capital argues that Defendants refer to themselves as simply "Engine" and do not always include the "No. 1," thereby undermining Defendants' claim that their mark evokes imagery of a firehouse. The Court is not persuaded. Engine Capital points to just a single instance in which "Engine" alone is used by Defendants, and Engine Capital takes

engines, and often their related firehouses, are commonly referred to as "engine" and a number. See, e.g., John Kelly, A Brave Rescue in 1978 is Still a Part of District Firefighting Lore, Wash. Post (Mar. 29, 2021), https://www.washingtonpost.com/local/dc-fire-rescue-medal/2021/03/29/da2b8f84-8da7-11eb-a6bd-0eb91c03305a_story.html (discussing a fire rescue by "Engine 21," a firehouse in Washington, D.C.); Sarah Maslin Nir, San Francisco Firefighters Become Unintended Safety Net for the Homeless, N.Y. Times (Aug. 26, 2015), https://www.nytimes.com/2015/08/27/us/san-francisco-firefighters-become-unintended-safety-net-for-the-homeless.html ("When the emergency bell sounds at Fire Station 1 here, firefighters pull on boots and backpacks, swing into Engine 1 and hurtles out the door in almost a single motion, a blast of red lights and caterwauling

---

that example out of context. In the fine print of a press release, Defendants referred to themselves as "Engine" after the following sentence: "Engine No. 1 LLC, Engine No. 1 LP, Christopher James, Charles Penner (collectively, 'Engine'), Gregory J. Goff, Kaisa Hietala, Alexander Karsner, and Anders Runevad (collectively and together with Engine, the 'Participants') intend to file with the Securities and Exchange Commission (the 'SEC') a definitive proxy statement and accompanying form of WHITE proxy to be used in connection with the solicitation of proxies from the shareholders of Exxon Mobil Corporation (the 'Company')." (Dkt. No. 48-26, at 4.) Defendants clearly identified themselves as "Engine No. 1" before designating the shorthand term "Engine" in the legal fine print. In light of this context, the Court does not find Defendants have referred to themselves as solely "Engine" in a manner that undermines their argument.

sirens."). "Engine Capital," on the other hand, does not evoke such imagery. Instead, inclusion of the word "Capital" suggests a finance-related entity.

In this way, the case at hand is akin to Flushing Bank v. Green Dot Corp., 138 F. Supp. 3d 561. In Flushing Bank, the court found that the marks "iGObanking" and "GoBank" were dissimilar because "iGObanking" evokes an impression of action whereas "GoBank" conveys the impression of a location. Id. at 587-88. Here too, the inclusion of "No. 1," like the "i" and "-ing" in "iGObanking," elicits an entirely different impression than does Engine Capital's mark.

In other words, "No. 1" is not a mere descriptive addition that leaves the term "engine" as the dominant term or focal point in "Engine No. 1." This distinguishes the present case from those that Engine Capital relies on in its briefing. For instance, Engine Capital cites Morningside Group Ltd. v. Morningside Capital Group, LLC, 182 F.3d 133, 140 (2d Cir. 1999), in which the Second Circuit concluded that the two marks were similar because "Morningside" was the only word that "stands out as dominant in the two names." The words surrounding "Morningstar" in the marks "Morningside Group Limited" and

"Morningside Capital Group, L.L.C." were otherwise overlapping or did "not serve any differentiating role." Id. By contrast, "Engine Capital" and "Engine No. 1" share only one word in common, and the term "No. 1" does serve a differentiating role by evoking a firehouse. In light of this resulting impression, it is unlikely potential investors would perceive and remember only the term "Engine."

Defendants' logo is also distinguishable from Engine Capital's logo in its color scheme, font, and layout:



This difference is significant because the parties' logos appear on the various examples of offering and marketing materials in the record. (See, e.g., Dkt. Nos. 59-12 (Defendants' website for the Exxon campaign), 59-11 (the Engine1 Website), 48-15 (Defendants' press release), 48-8 (Engine Capital's marketing materials), 48-9 (same).) Any reasonable investor would review these types of materials before making investment decisions. As such, the stark difference in the logos appearing in both parties' materials contributes to the Court's finding that as

23

presented in the marketplace, the marks are not similar to a significant degree. See Flushing Bank, 138 F. Supp. 3d at 588 (concluding that differences in the parties' logos undermined the plaintiff's argument of a high degree of similarity between their marks).

ii. Actual Confusion

Similarly, the fifth Polaroid Factor -- evidence of actual consumer confusion -- supports Defendants. Engine Capital's evidence of actual consumer confusion is minimal at best. Engine Capital has failed to introduce "survey evidence, empirical studies, or expert testimony to suggest that the public is or is likely to be confused," the absence of which is "significant." Atl. Richfield Co. v. Arco Globus Int'l Co., Inc., No. 95 Civ. 6361, 1997 WL 607488, at *8 (S.D.N.Y. May 29, 1997). "Although the plaintiffs need only demonstrate a likelihood of confusion and not actual confusion to warrant equitable relief, the Court may properly infer that there is no likelihood of consumer confusion from this absence of survey evidence." Universal City Studios, 634 F. Supp. at 1478 (citation omitted) (discussing whether the plaintiff adduced enough evidence of confusion to justify a preliminary injunction).

Engine Capital's evidence supporting a finding of

actual consumer confusion is limited to five affidavits[7] (only two of which are from investors) claiming confusion and some conclusory averments from Professor Partnoy. This evidence is insufficient to support a likelihood of consumer confusion.

"Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or de minimis." Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Clinic, LLC, 861 F. Supp. 2d 1293, 1304 (D. Kan. 2012) (citing 4 McCarthy on Trademarks § 23:14 (alteration omitted)) (discussing whether the plaintiff was entitled to a preliminary injunction); see also Grout Shield Dist., LLC v. Elie E. Salvo, Inc., 824 F. Supp. 2d 389, 415-16 (E.D.N.Y. 2011) (noting that six instances of confusion were de minimis in denying a motion for a preliminary injunction); cf. Water Pik, Inc. v. Med-Sys.,

---

[7] When filing its reply memorandum of law, Engine Capital included a second affidavit of Ajdler, which states that Ajdler learned of another instance of actual confusion since Engine Capital's initial filings. Ajdler attests, "Specifically, a third-party marketer claimed she recently saw Engine in the paper in connection with the ExxonMobil proxy contest and believed that Engine No. 1 was a SPV of Engine [Capital]." (Dkt. No. 70 ¶ 28.) The Court is not inclined to give much weight to this sixth instance of confusion because Ajdler's affidavit contains virtually no contextual details to aid the Court in its analysis. Even were the Court to accept that a sixth instance of confusion occurred, for the reasons discussed herein, that evidence does not meaningfully alter the Court's analysis or conclusion that the evidence is insufficient to demonstrate a likelihood of actual confusion.

Inc., 726 F.3d 1136, 1150 (10th Cir. 2013) (affirming the district court's conclusion that four instances of confusion are de minimis at the summary-judgment stage); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001) (affirming the district court's conclusion on a motion for summary judgment that two anecdotes of confusion were de minimis and citing cases). While the handful of instances of confusion Engine Capital has offered support a finding that confusion *might* occur, such a small number of instances is insufficient to support a finding that widespread confusion is *likely* to occur.

Worse yet, the affidavits do not suggest that any consumer confusion affected a consumer's investment decisions. "[T]he relevant confusion is that which affects the purchasing and selling of the goods or services in question," rather than "confusion generally." Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991) (internal quotation marks and citations omitted). But none of the affidavits suggested that the confusion the affiants experienced affected their investment conduct.[8] And all

---

[8] Engine Capital argues that the confusion need not affect the ultimate investment decisions and that it is sufficient that potential investors might avoid meeting with it or otherwise change their behavior as a result of the confusion. That may be, but Engine Capital's allegations of such confusion are speculative. Engine Capital has failed to

affiants learned, either by making inquiries of Ajdler or by independently researching, that Engine No. 1 was not affiliated with Engine Capital, further undermining Engine Capital's claim of actual confusion. See Nora Beverages, 269 F.3d at 124 ("[I]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion as such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself."); Medici Classics Prods. LLC, 590 F. Supp. 2d at 556 ("To show actual confusion, a plaintiff must demonstrate a diversion of sales, damage to goodwill, or loss of control over reputation." (internal quotation marks and citation omitted)).

Professor Partnoy's affidavit likewise does not provide sufficient evidence of a likelihood of consumer confusion. This affidavit states that "there is evidence that the public equity financial markets react to the use of a particular word that is in a firm's name, even when the use of the word is irrelevant to the firm," including when the investors are sophisticated. (Partnoy Decl. ¶ 27.) But Professor Partnoy cites only one anecdote for that

---

demonstrate that any consumer confusion affected the affiants' decisions to interact with Engine Capital.

conclusion: the example of Signal Advance, Inc., a small medical device company, whose stock price rose after being confused with the messaging app Signal following a tweet from Elon Musk saying "Use Signal." (Id. ¶ 27 n.30.) The Court is not persuaded that this single anecdote supports Professor Partnoy's sweeping conclusion. Nor is the Court persuaded that Professor Partnoy's general observation, which is devoid of analysis into the specific case at hand, suggests anything beyond the possibility of confusion. More than that is needed for a successful claim. See Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503 (2d Cir. 1997) (noting that the "test" for a trademark infringement claim "is not whether confusion is possible" but rather "whether confusion is probable among numerous customers who are ordinarily prudent").

Engine Capital argues that because Defendants have been in existence for less than a year, the absence of evidence of actual confusion should not weigh against Engine Capital. The Court acknowledges that the short timeframe may affect how many instances of confusion Engine Capital could adduce. But the issue with Engine Capital's evidence is not only its quantity, but also its quality. At best, Engine Capital's evidence suggests a handful of

28

individuals initially believed Defendants and Engine Capital were connected but, after inquiring or conducting their own research, realized there was no connection. Unlike in the cases Engine Capital cites involving sophisticated investors like those here, there is no evidence of a change in these individuals' investment behavior or of harm in the form of missed opportunities for Engine Capital. See K2 Advisors, LLC v. K2 Volatility Fund, LP, No. 02 Civ. 3984, 2002 WL 31235701, at *15 & n.1 (S.D.N.Y. Oct. 4, 2002) (noting that evidence that "a potential investor assumed that one of plaintiff's representatives was associated with K2 Volatility Fund" was sufficient to weigh this factor slightly in favor of finding confusion). Absent stronger evidence, the Court cannot conclude that Engine Capital is likely to succeed in showing actual confusion.

   iii. Bad Faith

   The sixth factor -- evidence of bad faith -- weighs in Defendants' favor as well. "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." Star Indus., Inc. v. Bacardi & Co., Ltd., 412

F.3d 373, 388 (2d Cir. 2005). "Selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." Id. (citation omitted).

The evidence proffered at this initial stage suggests Defendants acted in good faith. Engine Capital's sole argument with respect to bad faith is that Defendants must have known about Engine Capital, and therefore the use of "engine" in their mark indicates an intent to capitalize on the goodwill of Engine Capital's marks. But Engine Capital has not provided any definitive evidence that Defendants were aware of Engine Capital. It instead relies on its reputation and Defendants' role in the industry to argue for a finding of knowledge.[9] The Court is not persuaded. At the preliminary-injunction stage, courts are "not required to accept all [of plaintiff's] allegations as true or to draw all reasonable inferences in its favor." New Hope Family Servs., 966 F.3d at 165. Engine Capital has not established that its reputation is of such a stature to

---

[9] In its reply memorandum of law, Engine Capital seeks to rely on Defendants' failure to disavow knowledge in its briefing to support its claim that Defendants were aware of Engine Capital. The Court will not rely on this lack of denial. The burden of proof is on Engine Capital as the plaintiff to adduce evidence of awareness.

give rise to the inference it seeks. Inferring knowledge on Defendants' part requires too much speculation to be appropriate on the record presented here.

According to Engine No. 1 LP's Chief Operating Officer, Swift, James did conduct a trademark search when naming the company and came across numerous other financial entities with the term "engine" in their names. (Swift Decl. ¶ 3.) But there is no evidence to suggest that Engine Capital was amongst that group. Engine Capital's trademark applications were not filed until January 7, 2021. (Dkt. Nos. 48-1, 48-2.) Seeing that Engine No. 1 was founded in "fall of 2020" (Swift Decl. ¶ 3), and that its legal counsel submitted the application for its trademark on October 20, 2020 (Dkt. No. 59-1), it is reasonable to presume that the trademark search took place well before January 2021.

Instead, the trademark search suggests that Defendants acted with good faith, as does Defendants' explanation of the selection of the "Engine No. 1" mark. Defendants explain that James selected their mark to evoke the impression of a historic firehouse in San Francisco where he resides, and its function in society, thereby representing the alignment in Defendants' investments

31

between shareholder and stakeholder interests. (Swift Decl. ¶¶ 3-4.) This explanation for the selection of the mark is reasonable, and it militates against a finding that Defendants, even if they were aware of Engine Capital, acted with bad faith in choosing a mark to benefit from Engine Capital's reputation. See Star Indus., Inc., 412 F.3d at 388.

    iv.  Quality of Services

The seventh factor -- the respective quality of the services -- is neutral. This factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Sports Auth., 89 F.3d at 965. Engine Capital has failed to adduce any evidence that Defendants' services are of poor quality or inferior to Engine Capital's such that Engine Capital's reputation is at risk. Engine Capital concedes as much, simply stating that as a new fund, Defendants lack "an established reputation." (Pls. Mem. at 18.) But beyond a conclusory statement that "Plaintiff's service is excellent," which the Court does not need to accept as true, Engine Capital has provided the Court with no information from which to conclude that its reputation is at any risk of being harmed

by Defendants' mark.

>    v.   Relevant Consumers' Sophistication

The eighth factor -- the sophistication of the relevant population of consumers -- further cuts against Engine Capital. There is little dispute that the parties' clients are sophisticated.[10] Defendants' "privately-offered funds generally will be offered and marketed only to a limited group of investors who (i) are 'qualified purchasers' under Section 2(a)(51) of the Investment Company Act of 1940, (ii) seek capital appreciation through investments with a manager making impact investments focused on sustainable growth and long-term value, and (iii) who [sic] are able to invest a minimum $2 million investment." (Swift Decl. ¶ 10.) Engine Capital's investors likewise are "'accredited investors,' which include institutional investors, such as pension funds, as well as high-net-worth individuals." (Partnoy Decl. ¶ 21.) Given the types of investors and the amounts invested, there is little doubt that these investors make investment decisions after extensive research and "constitute a highly

---

[10] Engine Capital alleges that its "investors, potential investors and relevant stakeholders are not all sophisticated." (Pls. Mem. at 18.) The Court does not credit this allegation. Not only is it made without any citation to evidence in the record, but it in fact *contradicts* the

sophisticated market." Morningside Grp. Ltd., 182 F.3d at 142. This sophistication weighs heavily against a finding of a likelihood of confusion. Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 151 (2d Cir. 2003) ("Where the purchasers of a product[] [or service] are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks.").

It is true, as Engine Capital contends, that this is not always the case. For instance, the Morningside Group Court noted that when "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." 182 F.3d at 142. But here, the Court has already concluded that the marks do not share a high degree of similarity. Moreover, "Morningside Group presented evidence of actual confusion among several highly sophisticated investment professionals," id., but such evidence is lacking here. Indeed, the individuals who initially wondered at the connection between Engine Capital and Defendants did what any other highly sophisticated and reasonable consumer

---

very evidence that Engine Capital has put forth through its expert's affidavit, as discussed herein.

would have done: they made inquiries about the connection or conducted their own research and learned that there was no connection between these entities.[11] Thus, the record at this stage undermines any argument that the sophistication of relevant consumers favors Engine Capital.

In sum, upon a balancing of the Polaroid Factors, the Court cannot conclude that "there is a likelihood that a *significant*," if any, "number of consumers will be confused by the use of an allegedly infringing mark." The Deal, LLC v. Korangy Publ'g, Inc., 309 F. Supp. 2d 512, 530 (S.D.N.Y. 2004). It may be that Engine Capital could ultimately prevail on its claims. But at this stage in the proceeding, Engine Capital has failed to provide sufficient evidence to find it will likely succeed in proving that relevant consumers are likely to be misled about the true source of Defendants' services.

b.   Cybersquatting

To establish a claim of cybersquatting under the Lanham Act, "a plaintiff must demonstrate that: (1) its

---

[11] Although Engine Capital argues that confusion that leads potential consumers "into an initial interest" in Defendants "works a sufficient trademark injury" as explained in Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 260 (2d Cir. 1987), Mobil Oil is distinguishable. That case involved the oil trading market and included evidence that even sophisticated oil traders did not investigate a new company before initially communicating with it and would only investigate before

marks were distinctive at the time the domain was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark." N.Y.C. Triathlon, 704 F. Supp. 2d at 324. Engine Capital is not likely to succeed on its cybersquatting claim because, even assuming that it could demonstrate the first two elements, it fails to establish bad faith for the reasons set forth above.

Engine Capital argues that Defendants' bad faith is evidenced through the fact that they entered into direct competition with Engine Capital and because they must have been fully aware of the strength of Engine Capital's marks for consumers in the market. This is the same argument Engine Capital made with respect to the bad-faith Polaroid Factor. It fares no better here. For largely the same reasons discussed previously in section III.A.1.a.iii, the Court cannot conclude that Engine Capital is likely to prevail in showing that Defendants acted with bad faith. It is not clear whether Defendants were aware of Engine Capital at the time its websites were made, and Engine

---

entering into a deal. Here, on the other hand, there is no such evidence from investors.

Capital points to no evidence to that effect. And even if Defendants were aware of Engine Capital, its plausible explanation for choosing its mark as well as the differences in the parties' logos undermines any conclusion that Defendants intended to cause confusion and benefit off of Engine Capital's marks. Consequently, Engine Capital has not demonstrated it is likely to succeed on its cybersquatting claim.

    2.   <u>Irreparable Harm</u>

While Engine Capital has failed to demonstrate a likelihood of success on the merits of its Lanham Act claims, it is not entitled to injunctive relief for any of its claims because it has also failed to demonstrate that it will suffer irreparable harm absent an injunction.

As an initial matter, Engine Capital's reliance on a presumption of irreparable harm is unavailing. Under the Lanham Act, a rebuttable presumption of irreparable harm arises if a plaintiff demonstrates a likelihood of success on the merits. 15 U.S.C. § 1116(a). But as discussed above, Engine Capital has not made such a showing. The rebuttable presumption of irreparable harm therefore does not apply.

Nor does the record otherwise support a finding of irreparable harm. Engine Capital needed to "supply evidence

37

of the loss of reputation or good will." See Rush v. Hillside Buffalo, LLC, 314 F. Supp. 3d 477, 486 (W.D.N.Y. 2018); see also Sunni, LLC v. Edible Arrangements, Inc., No. 14 Civ. 461, 2014 WL 1226210, at *12 (S.D.N.Y. Mar. 25, 2014) (citing cases). Instead, it only supplied a handful of affidavits from individuals who were initially confused about the connection between Engine Capital and Defendants. Only two of those individuals were investors, and only one expressed displeasure about Defendants' conduct. More importantly, all individuals' confusion was dispelled once they made inquiries or conducted research into the matter. Evidence of consumer confusion is not equivalent to evidence of irreparable harm. See Herb Reed Enters., LLC v. Fla. Ent'mt Mgmt., Inc., 736 F.3d 1239, 1250-51 (9th Cir. 2013) (concluding that an email from a potential customer complaining "simply underscored customer confusion, not irreparable harm").

That notion applies with even greater force in this case given the lack of evidence of any detrimental effects from the purported confusion. As mentioned above, there is no evidence that Defendants' services are of an inferior quality. Nor is there evidence suggesting that the highly sophisticated clients that Engine Capital and Defendants

serve would be confused by Defendants' mark causing them to alter their investment behavior. Without such evidence, Engine Capital cannot support its conclusory assertions that "Defendants' infringement puts [its] goodwill at risk." (Pls. Mem. at 24.) And because it is well established that "conclusory statements of loss of reputation will not justify an irreparable harm finding," Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc., No. 10 Civ. 3314, 2015 WL 4033019, at *12 (S.D.N.Y. June 29, 2015), Engine Capital has failed to meet its burden of demonstrating irreparable harm.

For these reasons, Engine Capital's Motion for a Preliminary Injunction is denied.

B.   MOTION TO DISMISS

The Court now turns to Defendants' motion to dismiss the FAC. The claims against Penner are dismissed because the allegations are insufficient to give rise to his personal liability. The cybersquatting claim is also dismissed for failure to allege bad faith. But the Court is not persuaded that dismissal of the other causes of action is warranted when taking all allegations as true and drawing reasonable inferences in Engine Capital's favor.

39

1. <u>Personal Liability of Penner</u>

"[A] corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active conscious force behind [the defendant corporation's] infringement." <u>Cartier v. Aaron Faber, Inc.</u>, 512 F. Supp. 2d 165, 170 (S.D.N.Y. 2007). "Demonstrating that the corporation's officer authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient to subject the officer to personal liability." <u>Guthrie Healthcare Sys. v. ContextMedia, Inc.</u>, 12 Civ. 7992, 2014 WL 185222, at *13 (S.D.N.Y. Jan. 16, 2014) (internal quotation marks omitted).

Engine Capital has failed to make any allegations that Penner authorized or approved the trademark infringement at issue. Engine Capital offers only the entirely conclusory allegations that Penner was a "moving, acting and conscious force" behind Defendants' wrongdoing and directed and controlled Defendants' actions. (FAC ¶ 38.) But these "are mere legal conclusions and not entitled to a presumption of truth." <u>See</u> <u>Steve Madden, Ltd. v. Jasmin Larian, LLC</u>, No. 18 Civ. 2043, 2019 WL 294767, at *5 (S.D.N.Y. Jan. 22, 2019). Nor is it sufficient for Engine Capital to rely on

the allegation that Penner is a principal of Defendants to impute personal liability. See id. at *4 ("Courts in this Circuit have held that a defendant is not considered a 'moving, active, conscious force' if the only allegation made by the plaintiff is that the defendant holds a particular title, without alleging that the defendant authorized or approved any allegedly infringing action." (citing cases)). The FAC contains no other nonconclusory factual allegations suggesting that Penner authorized or controlled Defendants' allegedly infringing conduct, and Engine Capital points to none in its briefing. As a result, the FAC has failed to state a Lanham Act claim against Penner personally.

2.   Sufficiency of the Allegations for Counts One through Four

Counts One through Four allege common law and federal trademark infringement, cybersquatting, and trademark dilution under New York General Business Law § 360-l.[12]

---

[12] The Court notes that when pled in connection with infringement of a trademark, the elements necessary to prevail on the New York common law and New York General Business Law § 360-l claims track those required under the Lanham Act. See Artemis Mkt'g Corp. v. Rooms 2 Go Furniture, Inc., No. 09 Civ. 2413, 2009 WL 3247008, at *1 (E.D.N.Y. Oct. 6, 2009); Nike, Inc. v. Top Brand Co. Ltd., No. 00 Civ. 8179, 2005 WL 1654859, at *7 (S.D.N.Y. July 13, 2005). Therefore, for the purposes of this section, the analysis with respect to Engine Capital's claim for trademark infringement under the Lanham Act applies to the other counts. For this reason as well, the Court is not persuaded by

Defendants argue that these causes of action have been inadequately pled because Engine Capital has failed to allege facts suggesting more than a possibility of confusion, made only conclusory allegations with respect to harm or injury, and failed to plead facts indicating bad faith.

The facts in the FAC are sparse. But taking them as true and drawing reasonable inferences in Engine Capital's favor as it must at the motion-to-dismiss stage, the Court cannot conclude that the allegations underlying the trademark infringement and dilution claims are insufficient at this stage. The allegations giving rise to the cybersquatting claim are deficient, however, requiring dismissal of that claim.

A likelihood of confusion is determined through application of the eight Polaroid Factors. "There is no requirement that a plaintiff address the Polaroid factors in its pleading." Eliya, Inc. v. Kohl's Dep't Stores, No. 06 Civ. 195, 2006 WL 2645196, at *3 n.2 (S.D.N.Y. Sept. 13, 2006). "Likelihood of confusion is a fact-intensive analysis that ordinarily does not lend itself to a motion

Defendants' argument that Count Four should be dismissed for lack of a recitation of the elements or reiteration of the factual allegations underlying those elements.

to dismiss." <u>Van Praagh v. Gratton</u>, 993 F. Supp. 2d 293, 303 (E.D.N.Y. 2014) (citing cases). "A motion to dismiss will be granted for failure to plead likelihood of confusion only if no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove." <u>LBF Travel, Inc. v. Fareportal, Inc.</u>, No. 13 Civ. 9143, 2014 WL 5671853, at *8 (S.D.N.Y. Nov. 5, 2014) (internal quotation marks and citation omitted). Although the Court has found that Engine Capital is unlikely to prevail when resolving Engine Capital's motion for a preliminary injunction, the Court cannot conclude that no reasonable factfinder could find a likelihood of confusion on any set of provable facts. While Engine Capital has not adduced enough evidence to establish a probability of success in demonstrating a likelihood of widespread confusion, as needed to support its Motion for a Preliminary Injunction, it is possible that Engine Capital could at a later stage present stronger evidence that does support a finding of likelihood of confusion. Thus, the Court concludes that the allegations are sufficient to survive dismissal.

Similarly, "the elements necessary to establish a violation of § 43(a) of the Lanham Act do not include a

showing of actual injury or actual confusion. Proof of actual injury would be required for an award of damages, but the likelihood of confusion is sufficient harm to establish harm to the plaintiff." Do It Best Corp. v. Passport Software, Inc., No. 01 Civ. 7674, 2005 WL 2234651, at *7 (N.D. Ill. Sept. 12, 2005) (citing Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1204 (7th Cir. 1990)); see also Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 131 (3d Cir. 2004) (explaining that "the [trademark] infringement amounts to borrowing the senior user's reputation and goodwill, which is an injury in and of itself"). And while it is true that irreparable harm must be shown for injunctive relief, irreparable harm for a permanent injunction may be presumed "upon a finding of a violation" under the Lanham Act. 15 U.S.C. § 1116(a). Thus, because it is not apparent from the face of the FAC that Engine Capital could prove no set of facts establishing a likelihood of confusion, the FAC's allegations are enough to overcome a motion to dismiss.

Whether Engine Capital has sufficiently alleged bad faith for its cybersquatting claim is a closer issue. As mentioned above, a valid cybersquatting claim requires demonstrating that the infringing websites were registered

44

with a bad faith intent to profit off of the plaintiff's marks. In defending the sufficiency of its allegations, Engine Capital cites various paragraphs in the FAC about its established and well-known reputation and Defendants' launch. Its argument seems to be that these allegations show that Defendants entered into direct competition with Engine Capital in the same market (that is, public equities and shareholder activism) and must have been aware of the strength of Engine Capital's marks.

Even under the more lenient standard governing a motion to dismiss, the FAC fails to state a claim of bad faith. The FAC does not allege, even conclusorily, that Defendants actually knew of Engine Capital's marks. And even assuming that an inference of knowledge is reasonable to make, the facts that Defendants were aware of the marks and entered into direct competition with Engine Capital do not evidence bad faith without more. Indeed, in the case upon which Engine Capital singularly relies, Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 498-99 (2d Cir. 2000), the Second Circuit found bad faith because of evidence that the domain owner wanted to register the domain at issue for the purpose of keeping it away from the trademark owner *in addition to* evidence of awareness and

entry into direct competition. For example, there was evidence that the domain owner's entity was not formed until nine months *after* the domain name was registered and did not begin operations until after the trademark owner brought suit. Id. at 498. Here, on the other hand, the FAC gives no "details about when and under what circumstances Defendants registered" the allegedly infringing websites. Zimmerli Textil AG v. Kabbaz, No. 14 Civ. 1560, 2015 WL 5821523, at *6 (E.D.N.Y. Sept. 30, 2015). "Without these extra details, [Engine Capital's] cybersquatting claim is not plausible." Id.

## IV.    ORDER

Accordingly, it is hereby

**ORDERED** that the motion of Plaintiff Engine Capital Management, LP ("Engine Capital") for a preliminary injunction (Dkt. No. 40) is **DENIED**; and it is further hereby

**ORDERED** that the motion so deemed by the Court as filed by Engine No. 1 GP LLC, Engine No. 1 NY LLC, Engine No. 1 LLC, Engine No. 1 LP, Christopher James, and Charles Penner ("Penner") to dismiss the First Amended Complaint of Engine Capital pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (see Dkt No. 36) is

**DENIED IN PART** and **GRANTED IN PART** as set forth above. In particular, Count Two and the claims against Penner are **DISMISSED** without prejudice, but Counts One, Three, and Four remain; and it is further hereby

ORDERED that Engine Capital either file an amended complaint or notify the Court that it wishes to rest on the complaint as filed within twenty (20) days of the date of this Order.

**SO ORDERED.**

Dated:      New York, New York
            10 April 2021

                                        _____
                                          Victor Marrero
                                              U.S.D.J.

47